## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 10 2019, 8:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: G.B.-S., Minor Child, | September 10, 2019 |
| C.S., Father, | Court of Appeals Case No. 19A-JC-578 |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Mark Jones, Judge |
| Indiana Department of Child Services, | The Honorable Rosanne Ang, Magistrate |
| *Appellee-Petitioner,* and | Trial Court Cause No. 49D15-1810-JC-2521 |
| Child Advocates, Inc., | |
| *Guardian ad Litem.* | |

**Brown, Judge.**

[1] C.S. ("Father") appeals the trial court's order determining that G.B.-S. is a child in need of services ("CHINS"). Father raises two issues which we consolidate and restate as whether the evidence is sufficient to support the court's determination. We affirm.

## Facts and Procedural History

[2] On October 15, 2018, the Indiana Department of Child Services ("DCS") filed a verified petition alleging that G.B.-S., born on August 20, 2004, was a CHINS and that Father failed to provide G.B.-S. with a safe, stable, and appropriate living environment free from substance abuse. The petition also alleged that Father consumes alcohol in excess, breaks items in the home, is verbally abusive to the child when Father is under the influence, has forced the child to leave home when he is intoxicated, and that the child's mother ("Mother") had not successfully demonstrated an ability and willingness to appropriately parent the child. That same day, the court ordered continued removal of G.B.-S. from Mother and placement on a temporary trial visit with Father. The court also ordered that Father consume no alcohol, be placed on a track group monitor, attend Alcoholics Anonymous meetings, and obtain a sponsor.

[3] On January 2, 2019, DCS filed a Request for Taking or Continued Custody and Motion for Detention Hearing and attached an affidavit of Family Case Manager Lolita Burts ("FCM Burts") who asserted that FCMS Erin Bray-Mullens received a call from the Indiana Child Abuse Hotline on December 28, 2018, reporting that Indianapolis Metropolitan Police Officer Maria Ochon was at Father's home and stated that Father was intoxicated and had a physical

altercation with G.B.-S., and that G.B.-S. had told Officer Ochon that he had been struck in the back during the altercation. FCM Burts also stated that Father contested that he needed help from DCS because G.B.-S. was out of the home and would not be coming back. That same day, the court granted the motion and ordered the continued removal of G.B.-S. from Father's home and authorized the continued placement of the child in relative care.

[4] On January 18, 2019, the court held a fact-finding hearing. At the beginning of the hearing, Father's counsel stated that Father indicated to her that he could not make it to the hearing because he had to work and might have a warrant and asked if he could appear telephonically. The court asked: "So he's asking to telephonically appear at a court hearing regarding his child because he has a warrant and did not want to step into this building?" Transcript Volume II at 4. Father's counsel answered: "That's how I understood and he said he needs to work." *Id.* at 5. After some discussion, the court observed that Father had known about the hearing since November 16th and denied the request to appear telephonically.

[5] When asked about the circumstances that led to DCS's involvement with the family, FCM Burts answered: "I believe that there were altercations with [Father] and [G.B.-S.] and substance abuse." *Id.* at 8-9. She testified that "[e]very conversation that I have had with [Father] about services he has explicitly stated that he will not be participation [sic] in any more services with DCS." *Id.* at 9. She answered affirmatively when asked if it was DCS's belief that Father had some issues regarding alcohol use or substance abuse. When

asked why G.B.-S. was placed in relative care with his maternal grandparents, she stated: "There was an altercation in the home with [Father] where the police [were] called due to a physical altercation." *Id.* at 10. She indicated that she spoke to Father about the incident and he "denied any type of physical altercation and said that the altercation took place due to him punishing [G.B.-S.] for his phone privileges and internet privileges." *Id.* at 11. She testified that Father left voicemails for her in which he slurred his words and sent her text messages in which he called her a "stank ass skank" and a loser and told her that she was fired numerous times and that "he would make sure that [she] would never be able to f--- anybody again." *Id.* at 13. She testified that, when she asked Father about the text messages and voicemails, he did not recall making them. *Id.* She also indicated that she spoke with Mother who indicated to her that she thought Father had a substance abuse issue and had harassed her.

[6] FCM Burts indicated she believed it was in G.B.-S.'s best interest to remain out of the home and that Father needs to comply with services in order to remedy the safety concerns. She testified that she spoke with Mother and that "[d]ue to the physical altercation [Mother] feels that he's not safe with [Father]." *Id.* at 12. On cross-examination by Mother's counsel, she testified that Father previously told someone that he had issues with alcohol.

[7] At some point, Father's counsel stated that Father just contacted her and requested a continuance, and the court denied the request. During cross-examination by Father's counsel, FCM Burts testified that she had some safety

concerns regarding his excessive consumption of alcohol. When asked if she had a reason to believe that Father has substance abuse issues, she answered: "Well we did have him on the monitors, but he has stopped doing the breathalyzer monitor so there's no way for me to actually tell unless I actually physically see him drinking." *Id.* at 16. She stated that Father first stopped using the alcohol monitor around December 22nd, which "was right after I took on the case and then I went to go see him on the 27th in regards to the altercation that happened the prior weekend and then there was another altercation that Friday the 28th and then after that he stopped completely." *Id.* at 17. She testified that she spoke with Father and G.B.-S. "about the altercation, but it didn't seem like there was any animosity or static between the two while I was there." *Id.* at 18. She testified that she did not find any red flags or safety concern regarding Father's residence.

[8]     On redirect examination, she indicated that Father's non-compliance with services to ensure sobriety is a safety concern and that "[t]he fact that [Father] didn't recall those conversations and text messages led me to believe that he might have been under the influence." *Id.* at 22. She also answered affirmatively when asked if the case was opened because Father is an alcoholic and refuses to obtain help.

[9]     G.B.-S.'s grandfather testified that G.B.-S. was placed with him on December 28th. He testified that Father had "been mostly threatening and harassing my wife over [G.B.-S.] and saying he was going to take – take him out of parish school and that if she testified against him he would never – she would never

see him again." *Id.* at 24-25. He also stated: "[T]hey called us from the Cincinnati Hospital that they had been – they were on a day trip to Kings Island and his – they were in the line for the first ride and [Father] started getting woozy and passed out, so they – they took him to the hospital. Basically, he was drunk . . . ." *Id.* at 26. When asked if he knew there was a problem at that point, he answered: "We've known there was a problem for a long time, but you know at ten o'clock in the morning and – and, you know, clear to Cincinnati and passing out drunk at that point." *Id.* He indicated he was very concerned for G.B.-S.'s safety. He also stated that he provided necessities such as pencils and school clothes because Father would not provide those things. When asked why he would say that it was in G.B.-S.'s interest to be with him, he answered:

> [Father] is dangerous. Not only – I thought it was mostly just the drinking that he – that – get him going so much, but in reality it – according to . . . he was sober for six weeks or so in there and it was still much of the same. He'd call up and – he'd call up and say, "Come and get [G.B.-S.]", and then we get there and he wouldn't let him go and all of his stuff would be out on the front lawn and, "No, you can't pick up cause it's not yours", and . . . .

*Id.* at 27-28. He stated that he did not believe that Father was providing a safe and stable home for G.B.-S., that Father's home was "so unsettled," that G.B.-S. was "constantly in turmoil over there," and that G.B.-S. makes excuses for Father's behavior such as "it's because of the Court or its because of the drinking . . . ." *Id.* at 28.

On January 18, 2019, the court entered an Order Regarding Children in Need of Services which stated:

> The Court finds the following by the preponderance of the evidence:
>
> 1. [G.B.-S.] is 14 years of age.
>
> \* \* \* \* \*
>
> 3. [Father] has a history of alcohol abuse and intoxication in the presence of [G.B.-S.].
>
> 4. At the time of the filing of this cause of action, there were concerns for [Father's] abuse of alcohol and physical abuse of [G.B.-S.].
>
> 5. Since the filing of this matter, [Father] has engaged in excessive alcohol consumption while caring for [G.B.-S.] and has physically abused [G.B.-S.] on at least two occasions.
>
> 6. On December 28, 2018, [G.B.-S.] was placed in the care of his maternal grandparents due to his continued abuse.
>
> 7. Since [G.B.-S.] was removed from [Father's] care, [Father] has refused to engage in any substance abuse treatment.
>
> 8. Since placement in relative care, [Father] has been harassing the caregivers of the children. The caregivers of [G.B.-S.] believe [Father] to be dangerous.
>
> 9. [Father] exhibits erratic behavior when not believed to be under the influence of alcohol.
>
> 10. In addition to the substance abuse treatment, the DCS would also like [Father] to engage in a psychological evaluation to address mental health needs.

11.  [Mother] does not believe that [G.B.-S.] is safe in the care of [Father].  Additionally, [Father] has consistently harassed [Mother].  [Mother] is in agreement with [G.B.-S.] remaining in his current relative placement.

12.  [G.B.-S.'s] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision.  [G.B.-S.] is seriously endangered by [Father's] excessive use of alcohol, untreated mental health issues and abuse.

13.  [G.B.-S.] needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the Court.  As [Father] has refused to engage in treatment, the intervention of this Court is necessary to compel [Father] to engage.  Therefore, the Court finds [G.B.-S.] to be a child in need of services as alleged in the petition of the DCS.

Appellant's Appendix Volume II at 99-100.  On February 8, 2019, the court entered a dispositional decree.

### *Discussion*

The issue is whether sufficient evidence supports the trial court's determination of G.B.-S.'s status as a CHINS.  In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses.  *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied*.  Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom.  *Id.* at 1287.  As to issues covered by findings, we apply the two-tiered standard of whether the evidence

supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* "We will reverse a CHINS determination only if it was clearly erroneous." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[12] Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>>
>> (2) the child needs care, treatment, or rehabilitation that:
>>
>>> (A) the child is not receiving; and
>>>
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

(Subsequently amended by Pub. L. No. 198-2019, § 8 (eff. July 1, 2019)).

[13] The CHINS statute does not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction.

*Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.*

[14] Father argues that DCS did not show by a preponderance of the evidence that his actions seriously endangered his son. He asserts DCS did not provide evidence that he abused alcohol or G.B.-S. Specifically, he contends that "[t]he 'belief' and conjecture of the FCM is not evidence" and "[t]he Grandfather's testimony about an unidentified telephone caller from an unidentified Cincinnati hospital about an alleged incident at an amusement park (not witnessed by Grandfather) is also not evidence." Appellant's Brief at 11. He also argues that DCS failed to show that G.B.-S.'s needs were unmet and asserts that FCM Burts observed that the child had his own bed, there was food at the residence, and there was no red flag or safety concern regarding the suitability of his residence. DCS argues that the trial court's findings of fact are not clearly erroneous and support the conclusion that G.B.-S. is a CHINS.

[15] The record reveals FCM Burts's testimony regarding the altercations between Father and G.B.-S., Father's refusal to participate in services, his slurring of words and failure to remember his text messages and voicemails, his previous statement that he had issues with alcohol, and her safety concerns in light of his excessive consumption of alcohol. The court heard the testimony of G.B.-S.'s grandfather regarding an incident in which Father passed out drunk in the morning, Father's failure to provide necessities, his concern for G.B.-S.'s safety, G.B.-S.'s excuses for Father's behavior, Father's behavior in calling him and requesting that he pick up G.B.-S. only to later state that he could not pick him

up, Father's home as "so unsettled," and G.B.-S. as "constantly in turmoil over there." Transcript Volume II at 28. Based upon the evidence and testimony presented at the fact-finding hearing and in light of the unchallenged findings, we cannot say that the trial court's findings of fact, conclusions, and judgment are clearly erroneous.

[16] For the foregoing reasons, we affirm the trial court's determination that G.B.-S. is a CHINS.

[17] Affirmed.

Altice, J., and Tavitas, J, concur.